IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VICKIE KIM, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 3:20-cv-00154-S |
| | § | Hon. Karen Scholer |
| HCA HEALTHCARE, INC.; GREEN OAKS | § | |
| HOSPITAL SUBSIDIARY, L.P. | § | JURY DEMANDED |
| D/B/A MEDICAL CITY GREEN OAKS | § | |
| HOSPITAL; AND JOEL HOLINER M.D. P.A., | § | |
| | § | |
| *Defendants*. | § | |

## PLAINTIFF VICKIE KIM'S FIRST AMENDED COMPLAINT

COMES NOW, Plaintiff Vickie Kim ("Plaintiff") and files this First Amended Complaint

against Defendants HCA Healthcare, Inc.; Green Oaks Hospital Subsidiary, L.P. D/B/A Medical

City Green Oaks Hospital; and Joel Holiner M.D., P.A.; (collectively "Defendants").  In support,

Plaintiff states the following:

### I.
### PARTIES

1.      Plaintiff Vickie Kim resides in Prosper, Collin County, Texas.

2.      Defendant HCA Healthcare, Inc. ("HCA") is a Delaware corporation with its

principal place of business at One Park Plaza, Nashville, TN 37203. HCA is qualified to do

business in the State of Texas and is engaging in business in the State of Texas within the

meaning of Section 17.042 of the Texas Civil Practice and Remedies Code. HCA committed a

tort in whole or in part in the State of Texas and caused injury to a Texas resident. Upon

information and belief, HCA has had continuous and systematic contacts with the State of Texas

and has contracted with Texas residents over multiple years. HCA has ownership and control over its "Medical City" brand of hospital chains, including its wholly owned subsidiary, Defendant Green Oaks Hospital Subsidiary, L.P. D/B/A Medical City Green Oaks Hospital via a convoluted web of entities, including Columbia North Texas Healthcare System, L.P., Columbia North Texas Subsidiary GP LLC, and Columbia-SDH Holdings, Inc. HCA also insures its facilities via a 100% owned insurance subsidiary for losses up to $50 million per occurrence; however, this coverage is generally subject, in most cases, to a $15 million per occurrence self-insured retention. HCA was served by the Texas Secretary of State and hired counsel and filed a Motion to Dismiss Plaintiff's Original Complaint.

3.       Defendant Green Oaks Hospital Subsidiary, L.P. D/B/A Medical City Green Oaks Hospital ("Green Oaks") is a limited partnership with its principal place of business at One Park Plaza, Nashville, TN 37203. Defendant Green Oaks is qualified to do business in the State of Texas and is engaging in business in the State of Texas within the meaning of Section 17.042 of the Texas Civil Practice and Remedies Code.  Green Oaks committed a tort in whole or in part in the State of Texas and caused injury to a Texas resident.  Green Oaks has had continuous and systematic contacts with the State of Texas and has contracted with Texas residents over multiple years.  Green Oaks waived service, hired counsel, and filed a Motion to Dismiss Plaintiff's Original Complaint.

4.       Defendant Joel A. Holiner, M.D., P.A. is a professional association in the state of Texas that does business as The Holiner Psychiatric Group ("Holiner"). Holiner is engaging in business in the State of Texas within the meaning of Section 17.042 of the Texas Civil Practice and Remedies Code.  Holiner committed a tort in the State of Texas and caused injury to a Texas resident. Holiner has had continuous and systematic contacts with the State of Texas and has

contracted with Texas residents over multiple years.  Holiner waived service, hired counsel, and filed a Motion to Dismiss Plaintiff's Original Complaint.

## II.
## JURISDICTION AND VENUE

5.     This Court has personal jurisdiction over the Defendants. At all times relevant to these claims, Defendants had continuing and systematic contacts with the State of Texas and this judicial district by delivering services and products into the stream of commerce with the expectation that they would reach the State of Texas and this judicial district. Further, Defendants had minimum contacts with Texas and this judicial district and were doing business in Texas and this judicial district by, among other things, distributing, marketing, and selling their services and products to residents of the State of Texas and this judicial district.  All defendants have engaged in business in the State of Texas within the meaning of Section 17.042 of the Texas Civil Practice and Remedies Code, committed a tort in whole or in part in the State of Texas, and caused injury to a Texas resident. Upon information and belief, all Defendants have had continuous and systematic contacts with the State of Texas and this judicial district and have contracted with Texas residents over multiple years. Plaintiff's claims arise from such contacts and business.

6.     This court has subject matter jurisdiction over this suit based on federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States including Section 504 of the Rehabilitation Act (as amended), 29 U.S.C. §§ 794, 794a and the Affordable Care Act. This court has subject matter jurisdiction under Texas Health and Safety Code Section 576.001, which extends the protections of the laws and Constitution of the United States to people in mental health care facilities. This Court has supplemental subject matter jurisdiction over any claims that do not raise a federal question.

7.     Venue is proper in this District under 28 U.S.C. § 1391 (a)–(d) because, *inter alia*, substantial parts of the events or omissions giving rise to the claim occurred in the District and/or a substantial part of property that is the subject of the action is situated in the District.

## III.
## CONDITIONS PRECEDENT / REQUEST FOR JURY TRIAL

8.     All conditions precedent to Plaintiff's right to recover the relief sought herein have occurred or have been performed.

9.     Plaintiff requests a jury trial on the factual issues triable by jury under Federal Rule of Civil Procedure Rule 38.

## IV.
## FACTUAL SUMMARY

10.     HCA is an American Fortune 500 company based in Nashville, Tennessee. HCA is one of the largest hospital management companies in the world.

11.     Defendant Green Oaks is a mental health facility owned and operated by HCA under its "Medical City" brand of hospitals. Not unlike an all-inclusive hotel, these facilities charge by the day. The longer someone stays at one of these facilities, the more money is charged.

12.     Upon information and belief, Defendant Joel A. Holiner, M.D., P.A., has a medical directorship agreement with Green Oaks and/or HCA and received financial incentives, including money compensation from Green Oaks and/or HCA. Holiner is sued both in the capacity of a nonmedical director of Green Oaks and in the capacity of a medical director of Green Oaks.

13.    Holiner is on the medical staff of Green Oaks. He has the power to admit people to the hospital, keep them there, and not discharge them, whether the people want to be in the hospital or not.

14.    Upon information and belief, Holiner had a contract with Green Oaks and/or HCA to be paid money. Upon information and belief, Holiner, by and through one or more employees or agents, referred Plaintiff to Green Oaks.

15.    Upon information and belief, Green Oaks has a contract with HCA directly or by and through one or more affiliated and wholly-owned entities under the control of HCA.

16.    Neither Holiner nor Green Oaks qualifies as a qualified mental health referral service under Texas Health & Safety Code 164.007 because it fails to refer people to at least three different facilities and instead refers on a majority basis to Green Oaks.

17.    Holiner receives remuneration from Green Oaks and/or HCA in the form of discounted office space, money, or other benefit and that relationship was not fully disclosed to Vickie Kim, in violation of Texas Health & Safety Code 164.006(1), and (4).

18.    Vickie Kim ("Kim") has a history of anxiety, OCD, and postpartum depression. She has been married with three children and has, like many, experienced acts of betrayal on the part of her husband who engaged in several extra-marital affairs.

19.    Kim had been seeing Holiner for anxiety and OCD since 2011, and she had been on Zoloft (Sertraline) except for when she was nursing.

20.    Kim had sought formal disability status, which was known by Holiner and by Green Oaks by virtue of Holiner's medical directorship at least as far back as 2014.

21.    Kim's youngest child was born on 08/12/2017, and she was continuing to breast feed that child into January of 2018.

22.     Holiner, via one or more employees or agents, referred Kim to Green Oaks Outpatient Holistic Program.

23.     Kim was told that she could come in to Green Oaks at any time. She should have been told that Outpatient was only from 8:00 to 4:30 (or thereabouts), and the hours for inpatient assessment and admission were at any time.

24.     Kim arrived at Green Oaks in the evening, after 5pm, possibly around 10pm, on January 25, 2018, after taking the kids skating and picking up dinner.

25.     Kim specifically requested an accommodation for family participation in her therapeutic program and specifically requested that she be allowed to be with her baby.

26.     Further, Kim explained how important it was that she be able to pump breast milk and nurse her baby with her husband bringing her baby

27.     Even further, Kim explained that she needed to have the ability to leave whenever she wished.

28.     She requested therapy in a relaxed environment where she could leave at her will with freedom to be visited by her family, especially her baby. It was also discussed that she was breastfeeding, and she was informed that it would be all right for her to nurse.

29.     Kim has given a deposition in this case, and she incorporates her deposition testimony herein as if set forth in full as Exhibit 1.

30.     At Green Oaks and in her communications with Green Oaks, Kim said that she had been under the impression that she was signing up for a maternity ward type therapy program for counseling and support from other women.

31.     Instead of being able to fill out the paperwork for the outpatient program, in a safe and secure environment, she was taken out of the room that she was in due to a potentially violent patient and taken behind the locked doors of the facility.

32.     Eventually, someone wanted urine, her shoes, and a strip search along with billing, for which she refused to give information because she stated she wouldn't pay. At this time she was effectively admitted into the facility, even though she had not signed any of the required paper work or had any of her rights explained to her.

33.     The medical records reflect that her chief complaint was "I cannot stay here."

34.     The records reflect that Kim described a misunderstanding about the care that Holiner recommended.

35.     The records reflect that Kim stated she was to go to Green Oaks partial hospitalization/clinic and somehow, she ended up at Green Oaks inpatient.

36.     The records reflect that Kim stated that she wanted to leave and said she thought Green Oaks would be like Zale Lipshy U.T. Southwestern where her husband could bring the baby to breastfeed.

37.     There is nothing in the medical record that evidences anyone from Green Oaks spoke to her about care or daily routine or schedule.

38.     There is nothing in the medical record that evidences that anyone from Green Oaks discussed the availability of her insurance coverage.

39.     There is nothing in the medical record that evidences anyone from Green Oaks informed her of the expected daily costs of staying at the hospital or what part of the hospital costs she would be responsible for.

40.     There is nothing in the medical record that evidences anyone from Green Oaks told her who would be the attending physician providing her care.

41.     There is nothing in the medical record that evidences anyone from Green Oaks informed Kim that she could be billed separately by the doctors or other medical professionals for services at the hospital.

42.     There is nothing in the medical record that evidences anyone from Green Oaks verbally advised her of the Patient's Bill of Rights.

43.     There is nothing in the medical record that evidences anyone from Green Oaks actually provided a written copy of the Patient's Bill of Rights, nor did anyone have her sign a form stating that she was advised of those rights.

44.     There is nothing in the record that reflects that she was provided three options of where to get inpatient care from any referral service.

45.     Likewise, there is nothing in the medical record that evidences that anyone from Green Oaks gave her information, either verbally or in written form, on what specific rights she had during an inpatient stay at the hospital under the Mental Health Code.

46.     In Green Oaks, she felt like she had no power and no say in anything.

47.     At intake, Green Oaks staff told her that she was being admitted, despite her saying, "no" and that she "wanted to go home."

48.     Her medical record was falsified to indicate that she was suicidal, when she was, in fact, not suicidal.

49.     There is nothing in the medical record evidencing that she ever agreed to the admission apart from an admission for outpatient therapy.

50.     There is nothing in the medical record evidencing she ever received informed consent as to any of the medications she was prescribed.

51.     At Green Oaks, she was intimidated and forced into a voluntary commitment.

52.     At Green Oaks, she made repeated verbal requests to leave the facility for her entire stay and requested that personnel contact Holinar to get her out of the hospital.

53.     Green Oaks failed to release her within four hours of her first request, she was never presented with a letter to leave against medical advice, and Green Oaks failed to obtain a court order of protective custody or an emergency apprehension and detention warrant to secure the legal right to hold her.

54.     After she was allowed to pump milk, the staff told Vickie that she had to discard all of it, and they said her husband could not bring her baby. She was eventually released on January 30, 2019 after seeing Holiner.

55.     The Plaintiff in this case was held against her will in a mental health institution because she was treated as if she had an impairment, without regard to whether it was appropriate for her to be held there or not. This caused her injury.

56.     At the time Plaintiff arrived at Green Oaks, she was regarded as suffering from a cognitive disability, including but not limited to: documented anxiety, depression, post-partum depression, was breast feeding, and had OCD; all of which severely impaired the Plaintiff's cognitive abilities. Each Defendant was part of a conspiracy to subject Plaintiff to treatment as an inpatient when each Defendant should have seen Plaintiff on an outpatient basis, and this allowed them to take advantage of Plaintiff. Plaintiff was regarded as having a disability because she  was certified as someone who required mental health institutionalization and was billed for her stay.

57.     Alternatively, her medical records were falsified based upon a perceived disability of suicidality.

58.     Alternatively, Plaintiff was actually disabled because of anxiety, depression, post-partum depression, was breast feeding, and had OCD.

59.     Alternatively, Plaintiff actually suffered from a disability that was wholly unrelated to the alleged reason for their purported treatment, here being a new mother who was still breastfeeding. Defendants' discriminatory conduct occurred before any treatment was provided and on the basis of an unrelated disability that had no bearing on the type of purported benefit or service that Defendants forced on Plaintiff. In this way, Defendants took advantage of Plaintiff by treating her as a crazy person who did not know better and deserved to be locked in a facility and held against her will.

60.     Additionally, Plaintiff was discriminated against due to her gender by not being able to be with her baby and provide the baby breastmilk and breastfeed the baby.

## V.
## CAUSES OF ACTION

### FEDERAL QUESTIONS: VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT & SECTION 1557 OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT

### A. Introduction

61.     Plaintiff incorporates all prior and subsequent paragraphs as if fully restated and re-alleged herein.

62.     As many as one in five people in the United States is a person with a disability. These citizens include our veterans, elected officials, and even professionals.

63.     The source of numerous disabilities are attributable to what are commonly understood as health issues, including mental health issues.

64.     There are laws in this country that are designed to prevent the marginalization and harm to people who have a disability, including mental health issues. These laws apply broadly to private institutions that accept federal money, regardless of whether your business is garbage collection or practicing medicine.

65.     HCA is a business that accepts federal money.

66.     Green Oaks is a business that accepts federal money.

67.     Holiner is a business that accepts federal money.

68.     Health care providers who accept federal money are required to make reasonable modifications (or changes) to policies, practices, and procedures to provide equal access to facilities and services to people with disabilities. The term "reasonable modification" is a broad concept that covers every type of disability.

69.     It is not the case that medical providers whose bills are paid with federal money can provide specialized care to a specific number of patients and thus be immune from compliance with the Rehabilitation Act. The opposite is true. For example, orthopedic surgeons should have ramps for people with broken legs, regardless of whether in their medical judgment the patients should be attempting to navigate stairs.

70.     The application of the Rehabilitation Act is highly dependent on the factual circumstances that are presented in a given case. Because the law and its application are so broad, special attention must be paid to the location at issue. At a minimum the following questions must be answered to analyze a claim: what is the premises at issue? Who is the person within the premises or attempting to access the premises who has a disability? What is the disability? Was the disabling condition known or communicated to the persons in control of the premises?  Is there a well-understood accommodation that is provided to someone with such a

disability? Is it reasonable for the particular defendant to provide the requested accommodation? Does the defendant provide that accommodation to others and not the plaintiff?  Was the plaintiff harmed?

71.     The 5th Circuit has applied the Rehabilitation Act to decisions made by for-profit health care providers, including hospitals. *Perez v. Drs. Hosp. at Renaissance, Ltd*., 624 F. App'x 180 (5th Cir. 2015) (failure to provide interpreter to deaf parents of child).

72.     Courts in other circuits have applied the Rehabilitation Act similarly to health care providers. *See, e.g., Crane v. Lifemark Hosps., Inc*., 898 F.3d 1130 (11th Cir. 2018) (communications with deaf patient); *Silva v. Baptist Health S. Fla., Inc*., 856 F.3d 824 (11th Cir. 2017) (similar); *Reed v. Columbia St. Mary's Hosp*., 782 F.3d 331 (7th Cir. 2015) (retaliation claim by patient); *Loeffler v. Staten Island Univ. Hosp*., 582 F.3d 268 (2d Cir. 2009) (interpreter for deaf patient and spouse).

73.     The United States Supreme Court has also recognized that 504 claims can exist against a hospital (although not finding discrimination under the particular facts) in *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 624 ("It follows, under our decision in *Alexander v. Choate*, 469 U.S. 287, 301, 105 S.Ct. 712, 720, 83 L.Ed.2d 661 (1985), that handicapped infants are entitled to "meaningful access" to medical services provided by hospitals, and that a hospital rule or state policy denying or limiting such access would be subject to challenge under § 504.").

74.     There is no categorical exclusion of hospitals and other people who may provide medical or other judgment from the Rehabilitation Act. In fact, the law's implementing regulations specifically apply to health care providers. Nevertheless, various courts have struggled with the application of the Rehabilitation Act to health care providers and there is case law that indicates an exclusion of certain kinds of claims, which are commonly referenced as

claims based on medical judgment. Yet, from a textual perspective, there is nothing in Sec. 504 or the ADA that supports a healthcare exclusion. Plaintiff maintains that a healthcare provider could say that everything that they are doing is based on medical judgment but could still be engaging in actionable discrimination.

75.    Plaintiffs contend that applying a standard of medical judgment as a vehicle of dismissal is not appropriate. Plaintiffs contend that the medical judgment defense is one that is based in state law and not federal law and has no application in the analysis of the Rehabilitation Act. Creating a medical judgment exception denies citizens the equal protection of the law.

76.    Plaintiff suggests that the "medical judgment" rule that has developed in the precedent—and which has no basis in the plain language in the law—should not be applied. But, if the rule is to be applied, then it should be applied like the business judgment rule, an affirmative defense in some kinds of cases or a defense in avoidance that a jury might be given an instruction to consider. Why? Any defendant could say that they used their judgment as an educator, business owner, government official, doctor, or lawyer to deny a disabled person's request for a reasonable accommodation. If a kid reads slowly because of dyslexia, and it is reasonable to give the kid more time, it doesn't matter if the teacher's judgment is that the kid just needs to read faster. The Rehabilitation Act removes some amount of discretion from the person in a position of authority, even if that discretion involves professional judgment.

77.    To the extent that medical judgment is implicated it would conflict with the reasonableness standard that applies under the Rehabilitation Act, which would effectively preempt and supersede medical judgment which is governed by state law and local custom.

78.    Regarding reasonableness, the United States Supreme Court stated in *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002), that the lower courts were correct in holding that the

plaintiff's obligation "need only show that an 'accommodation' seems reasonable on its face, i.e., ordinarily or in the run of cases." The Fifth Circuit applied that standard to ADA Title III cases in *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997). As to claims under 504, in the past the Fifth Circuit has stated that "[t]he best that opinions following Davis have been able to state definitively is that an educational institution must make 'reasonable,' but not 'fundamental' or 'substantial' modifications to accommodate the handicapped." *McGregor v. Louisiana State Univ. Bd. of Sup'rs*, 3 F.3d 850, 858 (5th Cir. 1993).

79.    Examples of reasonable accommodations that a health care provider can provide include granting an early appointment to a patient with anxiety so that fewer people will be in the office and noise will be minimal, allowing a companion to assist a person, allowing additional time to explain care to a patient with an intellectual disability, providing assistance to patients with filling out information in documents, and/or allowing a service dog that has been trained to alert their handler with a seizure disorder at the onset of a seizure to be present in an exam room.

80.    But what is reasonable for a massive organization like HCA, who has enormous power, money, and resources may not be reasonable for a single-doctor medical practice. The defendants in this case have the ability to provide accommodations that other organizations cannot; it likely is a competitive advantage.

81.    To be clear, Plaintiff's Sec. 504 claims are not based on medical negligence or medical treatment decisions. Instead, she complains of Defendants' disparate treatment, which was solely because of her disability. She also complains of the Defendants' failure to make reasonable modifications in policies, practices, or procedures, when the modifications were necessary to avoid discrimination on the basis of disability.

82.     Sec. 504 of the Rehabilitation Act of 1973 protects anyone with a disability as defined by the ADA Amendments Act of 2008. 29 U.S.C. § 705(20)(B); Pub. L. 110–325, Sec. 7, 122 Stat. 3553 (Sept. 25, 2008). Plaintiff is a person with an "actual" disability within the meaning of Sec. 504. An "actual" disability includes a mental impairment that substantially limits one or more major life activities.

83.     At all relevant times, Plaintiff had, and had been diagnosed with, an anxiety disorder, depression, post-partum depression and obsessive-compulsive disorder. All are recognized mental-health diagnoses. All substantially limit the major life activity of brain functioning. In addition, they substantially limited Plaintiff in the major life activities of thinking, cognition, sleeping, understanding information, interacting with people and impeded her ability to do those things on a daily basis. Defendants knew of the Plaintiff's diagnoses and their manifestations.

84.     At all relevant times, Plaintiff was a "qualified" because she met the eligibility requirements for the Defendants' services, 45 C.F.R. § 84.3(l)(4), and had been accepted by Defendants for treatment.

85.     At all relevant times, Defendants were programs or activities receiving Federal financial assistance, and thus were covered by, and subject to, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and its implementing regulations. Defendants are all principally engaged in the business of providing healthcare. Under Sec. 504, "programs or activities" include an entire corporation, partnership, or other private organization, or an entire sole proprietorship, if it is principally engaged in the business of providing healthcare. 29 U.S.C. § 794(b)(3); 45 C.F.R. § 84.3(f).

86.     Plaintiff had a "regarded as" disability. Sec. 504 adopts the ADAAA's disability analysis, and under it, a "regarded as" disability is established if an individual has been subjected to a prohibited act "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). As shown above, Plaintiff had various mental impairments, which Defendants were well aware of.

87.     Sec. 504 prohibits excluding a person from participation in, or denying the benefits of, services, programs, or activities because of the person's disability. It also prohibits other forms of discrimination because of the person's disability. Among other things, actionable discrimination includes, on the basis of disability:

- Denying the opportunity to participate in or benefit from the aid, benefit, or service. 45 C.F.R. §§ 84.4(b)(1)(i) and 84.52(a)(1).
- Affording an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others. 45 C.F.R. §§ 84.4(b)(1)(ii) and 84.52(a)(2).
- Providing an aid, benefit, or service that is not as effective as that provided to others. 45 C.F.R. §§ 84.4(b)(1)(iii) and 84.52(a)(3).
- Providing different or separate aids, benefits, or services to individuals with disabilities, or to any class of individuals with disabilities, than is provided to others. 45 C.F.R. §§ 84.4(b)(1)(iv) and 84.52(a)(5).
- Limiting a person with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service. 45 C.F.R. § 84.4(b)(1)(vii).
- Providing benefits or services in a manner that limits or has the effect of limiting the participation. 45 C.F.R. § 84.52(a)(4).

88.     Plaintiff's Sec. 504 claims are not based on any medical or psychiatric treatment decisions made in this case. Instead, Plaintiff complains of the Defendant's discriminatory conduct because of her disability, or class of disability. That is, even assuming the medical or psychiatric decisions were appropriate (which they weren't), Defendants engaged in discrimination as described above and below. This includes the fact that other hospital patients are allowed to express milk and convey it to family members, but she was not. It also includes

the fact that other hospital patients are allowed to discharge themselves, even against medical advice, when there is no contrary court order, but she was not. And it includes the fact that Defendants falsified Plaintiff's records, which other patients do not experience.

## B.  Count 1: Failure to Accommodate in Violation of Sec. 504

89.    Plaintiff incorporates all prior and subsequent paragraphs as if fully restated and re-alleged herein.

90.    Plaintiff suffered from OCD and post-partum depression. This meant that she was simultaneously hyper-vigilant and as manifested had an extreme need to be with her child. Denying a still-breast-feeding mother with post-partum depression and obsessive compulsive disorder access to her child and access to instruments to provide the child with breast milk was discriminatory because other patients within Medical City were allowed to do that.

91.    Alternatively and/or additionally, there are well-understood and widely acknowledged methods and means to communicate with people who are entering a mental health hospital. Defendant failed to provide this accommodation to Vickie Kim when those accommodations are provided to other patients at the hospital, which is mandatory and not subject to medical judgment. In particular, Defendants failed to provide her with the information and disclosures that are stated and mandated by law, which can be found in Chapter 164 and 321 of the Texas Health & Safety Code and the Texas Mental Health Code. These mandatory communications are more fully described below, *infra,* and they do not implicate medical judgment because they are specific rules and not mere guidelines. For example and as one illustration, there is a specific form that must be given containing the bill of rights; providers, in their judgment cannot deviate from providing it and cannot deviate from the language. More

specific descriptions are provided later in this document. Plaintiff specifically does not plead here for any violation that implicates a discretionary standard of care.

92.     This caused various kinds of harm to the Plaintiff, including physical harm, mental harm, and loss of enjoyment of life.

### C. Count 2: Disparate treatment in Violation of Sec. 504

93.     Defendants were required by Sec. 504 to make reasonable modifications in policies, practices, or procedures if the modifications are necessary to avoid discrimination on the basis of disability. Plaintiff was breastfeeding her youngest child when she was detained against her will by the Defendants. She requested that she be allowed to express milk, and have it delivered to her child. This was a reasonable modification of Defendant's practices, but they refused to allow, provide, or support this, or even discuss it further. Their actions therefore violated Sec. 504's modification obligation.

94.     Failing to allow Kim to express milk and convey it to family members, when other patients are allowed to do so, was an instance of disparate treatment discrimination to Kim.

95.     Failing to allow Kim to discharge herself, even against medical advice, when there is no contrary court order, which other patients are allowed to do, but Kim was not was an instance of disparate treatment discrimination to Kim.

96.     Falsifying Kim's patient records, as described in the complaint, which other patients do not experience, was an instance of disparate treatment discrimination to Kim.

97.     Finally, Referring to Kim as "neurotic" was discriminatory and mean and was not based on medical judgment.

98.     This caused various kinds of harm to the Plaintiff, including physical harm, mental harm, and loss of enjoyment of life.

**D. Count 3: Gender Discrimination under Section 1557 of the Patient Protection and Affordable Care Act (42 USC 18116)**

99.    Plaintiff incorporates all prior and subsequent paragraphs as if fully restated and re-alleged herein.

100.    The ACA provides that an individual shall not be excluded from participation in, be denied the benefits of, or be subjected to discrimination on the grounds prohibited under Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq. (race, color, national origin), Title IX of the Education Amendments of 1972, 20 U.S.C. 1681 et seq. (sex), the Age Discrimination Act of 1975, 42 U.S.C. 6101 et seq. (age), or Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794 (disability), under any health program or activity, any part of which is receiving federal financial assistance.

101.    Plaintiff alleges that the failure to allow Kim to pump breast milk and breast feed her child constituted gender discrimination.

102.    This caused various kinds of harm to the Plaintiff, including physical harm, mental harm, and loss of enjoyment of life.

**C**OUNTS IN THE ALTERNATIVE**: V**IOLATIONS OF **T**EXAS **D**ECEPTIVE **T**RADE **P**RACTICES **A**CT**; T**IE-IN **S**TATUTE **C**HAPTER **164** OF THE **T**EXAS **H**EALTH AND **S**AFETY **C**ODE

103.    Plaintiff incorporates all prior and subsequent paragraphs as if fully restated and re-alleged herein.

104.    Chapter 164 of the Texas Health and Safety Code requires an inpatient mental health facility to make certain disclosures to a prospective patient before the prospective patient may be admitted to the facility. Specifically, hospital staff was required to provide Plaintiff the following: the availability of insurance coverage to pay for services, the expected daily costs of staying at the hospital or what part of the hospital costs they would be responsible for; who

would be the attending physician providing her care; that the patient would be billed separately by the doctors or other medical professionals and services at the hospital; notice of Patient's Bill of Rights; a copy of such rights and the duty to obtain a signature from the prospective patient that she had received such rights. Moreover, once admitted, the patient cannot be threatened or mislead about their right to leave the facility. See Texas Health & Safety Code §164.009.

105.    Parts of the Treatment Facilities Marketing & Practice Act apply to any "person." Tex. Health & Safety Code § 164.010. Other sections apply to facilities and those "under contract with a facility" if acting on behalf of the facility. See id. at 164.006.

106.    Plaintiff pleads that Defendants violated one or more provisions of the treatment facilities marketing practices act and caused injury to Plaintiff, including but not limited to the provisions set forth in the following paragraphs.

107.    Chapter 164 of the Texas Health and Safety Code comprises the Treatment Facilities Marketing Practices Act. Tex. Health & Safety Code §§ 164.001 et seq. A person may bring suit under the DTPA for a violation of that Act. Id. § 164.013. This type of claim is referred to as a "tie-in statute," meaning that the statute ties into the DTPA but with greater damages. Instead of being restricted to traditional DTPA damages, "the claimant… may recover any actual damages," and if the conduct was committed knowingly or intentionally, then "the trier of fact is authorized to award a total of not more than three times actual damages." Tex. Bus. & Comm. Code § 17.50(h). Under the DTPA, "each consumer who prevails shall be awarded court costs and reasonable and necessary attorneys' fees." Tex. Bus. & Comm. Code § 17.50(d). The DTPA/Chapter 164 claims include:

**Preadmission Violations:**

i. Conditioning employee or agent relationships on patient admissions, revenue, contacts, or volume or length of stay determinations. TEX. HEALTH & SAFETY CODE § 164.005

ii. The use and operation of illegal referral sources. TEX. HEALTH & SAFETY CODE § 164.006(1), (4) via the failure to disclose payment relationships and failure to operate a qualified mental health referral service

iii. The use and operation of illegal referral services, *id.* §§ 164.007(6), (8), (9) by failing to refer to three places that are unaffiliated, failing to provide appropriate disclosures, and failing to maintain the disclosure; and failing to disclose the relationship in advertising, *id.* 164.008(2), (3).

iv. Advertising, expressly or impliedly, the services of a treatment facility through the use of any unsubstantiated claims. *Id.* § 164.010(1)(B);

v. Advertising, expressly or impliedly, the availability of intervention and assessment services unless and until the services are available and are provided by mental health professionals licensed or certified to provide the particular service. *Id.* § 164.010(2);

vi. Failure to disclose an affiliation between a treatment facility and its soliciting agents/ contractors, before soliciting a referral source or prospective patient, to induce a person to use the services of the treatment facility. *Id.* § 164.010(3);

vii. Obtaining information considered confidential by state or federal law regarding a person for the purpose of soliciting that person to use the services of a treatment facility without consent. *Id.* § 164.010(4);

viii.  Failure to provide, in writing, the estimated charge with an explanation that patient will be billed separately for services provided by mental health professionals. *Id.* § 164.009(a)(1);

ix.  Failure to provide, in writing, the name of the attending physician. *Id.* § 164.009(a)(2);

x.  Failure to provide, in writing, the current "patient's bill of rights". *Id.* § 164.009(a)(3);

**Postadmission Violations:**

i.  If request to leave made against medical advice, unless made by a physician or made on the written instruction of a physician who has evaluated the patient within 48 hours of the representation, facility represents to the patient that the patient will be subject to an involuntary commitment proceeding or subsequent emergency detention. *Id.* 164.009(c)(1); and

ii.  If request to leave made against medical advice, facility represents that the patient's insurance company will refuse to pay all or any portion of the medical expenses previously incurred. *Id.* 164.009(c)(2).

108.  Each Defendant failed to satisfy the requisites of the Treatment Facilities Marketing & Practice Act in total or in part, as to the Plaintiff. Such failures rise to the level of a knowing violation of the Texas Deceptive Trade Practices Act, Texas, see Texas Health & Safety Code § 164.013; Texas Business & Commerce Code, § 17.46(b); § 17.50(h).

109.  For this cause of action, Plaintiff seeks actual damages, treble damages, attorney's fees, and costs.

110.    These causes of action are not governed by Chapter 74 of the Texas Civil Practice and Remedies code because they do not relate directly to healthcare and are instead related to marketing practices.

111.    Chapter 74 contains a limited preemption of the DTPA. Tex. Civ. Prac. & Rem. Code § 74.004 (DTPA does not apply to claims "alleged to have resulted, from negligence"). The DTPA causes of action asserted by Plaintiff are not negligence claims. Instead, the claims are akin to strict liability because the standards relate to time, providing certain documents, and set forth standards that do not provide for or require professional judgment. Moreover, as to Defendant HCA, the claims are not against a doctor or healthcare provider.

112.    Chapter 74's conflicts of law provision does not apply in Federal Court because it permits procedural preemption, which allows Chapter 74 to preempt "a rule of procedure or evidence or court rule," without limitation to state courts. Tex. Civ. Prac. & Rem. Code § 74.002.

113.    Alternatively, if some part of Chapter 74's conflict of law provision applies in federal court, then the only effect is that there is a potential cap of mental anguish damages to be applied post-verdict.

**COUNTS IN THE ALTERNATIVE: CLAIM FOR STATUTORY DAMAGES UNDER CHAPTER 321 OF THE TEXAS HEALTH & SAFETY CODE, VIOLATIONS OF THE TEXAS MENTAL HEALTH CODE**

114.    Plaintiff incorporates all prior and subsequent paragraphs as if fully restated and re-alleged herein.

115.    A patient has a private cause of action against a mental health facility that violates Texas Health & Safety Code Chapters 241, 321, 571, 572, 574, 576, and 577 or any of the rules created to further those chapters. A plaintiff who is receiving care or treatment in or from the facility and who is harmed as a result of the violation may sue for "actual damages, including

damages for mental anguish," "exemplary damages," and "reasonable attorney fees". Tex. Health & Safety Code §321.003(a), (b), (c), & (d).

    **a.  Chapter 241 Claims**

116.    Plaintiff has a private cause of action against the mental health facilities for violating Texas Health & Safety Code Chapter 241, the Texas Hospital Licensing Law, for failing to have policies on patient transfers (§ 241.055) and for failing to secure the informed refusal of a patient or of a person acting on the patient's behalf to a transfer or to related examination and treatment (§ 241.027(e)).

117.    Plaintiff has a private cause of action against the facility for violating the Texas Administrative Code sections that implement Texas Health & Safety Code Chapter 241, including Subchapter J of Chapter 133 of Title 25 of the Texas Administrative Code, the purpose of which "is to implement Health and Safety Code, Chapter 241." In particular, the regulations state that: "Parents shall have reasonable access to their infants at all times and be encouraged to participate in the care of their infants."  25 TAC § 133.205(a). Infant means a child from birth to one year of age. Id. at § 133.182(13).

118.    Plaintiff has a private cause of action against the facility for violating the Texas Administrative Code sections that implement Texas Health & Safety Code Chapter 241, including abuse under 25 TAC § 133.47, including, 133.47(c)(1)(A)(ii) which defines abuse to include "coercive or restrictive actions that are illegal or not justified by the patient's condition and that are in response to the patient's request for discharge or refusal of medication, therapy or treatment." It is illegal and not justified to disrupt a mother's right to breastfeed her child under Texas Health & Safety Code Section 165.002, therefore it is a form of abuse that is actionable under Chapter 321 since it involves the violation of an applicable regulation.

**b.  Chapter 321 Claims**

119.    Plaintiff has a cause of action for the violation of Texas Health & Safety Code Chapter 321, Provision of Mental Health, Chemical Dependency, and Rehabilitation Services. These claims largely pertain to "bill of rights" violations. The claims in this case are for:

  i.  Failing to ensure that within 24 hours of admission that the rights specified in the written copy of the patient's bill of rights are explained to the person and, if appropriate, to the person's parent, orally, in simple, nontechnical terms in the person's primary language. § 321.002(f);

  ii.  Failing to ensure that each patient admitted "signs a copy of the document stating that the person had read the document and understands the rights specified in the document" § 321.002(g)(1);

  iii.  Failing to ensure that "the signed copy is made a part of the person's clinical record." § 321.002(g)(2); and

  iv.  Failing to "prominently and conspicuously post a copy of the 'bill of rights' for display in a public area of the facility that is readily available to patients, residents, employees, and visitors" that is "in English and in a second language." § 321.002(h).

**c.  Texas Mental Health Code Claims [Chapter 571 to 578 Claims]**

120.    A patient has a private cause of action against a mental health facility that violates Texas Health & Safety Code Title 7 Subtitle C [Sections 571.001 et seq. to 578.001 et seq.], known as the Texas Mental Health Code.

121.     Here Plaintiff has Chapter 571 Claims because of each facility's failure to provide prescription medication information under § 571.0066; abusive treatment methods under § 571.0065; and failure to utilize the least restrictive appropriate setting under § 571.004.

122.     Plaintiff contends that in addition to, and in the alternative to the foregoing, every one of the various allegations of acts and omissions, separate and apart from the above, and regardless of whether or not any Defendant is negligent or has acted intentionally as to other theories of recovery, constitutes violations of Plaintiff's general patient rights under the Texas Mental Health Code, see Tex. Health & Safety Code, Title 7, Subtitle C, and 25 Texas Admin. Code; Chapter 404.

123.     In addition, and in the alternative, Plaintiff contends that her rights pursuant to Title 2, Article 3, Subchapter L, of Texas Health & Safety Code, relative to "Abuse, Neglect and Exploitation," and specifically found at § 576.021(5); 25 TAC 404.154, were likewise violated by Defendants.

124.     In consideration of these various statutory and regulatory violations by the Defendants, pursuant to Title 4, Subtitle G, Chapter 321, § 321.003 of the Tex. Health & Safety Code, Plaintiff sues for a violation of her Patient Rights by each Defendant.

125.     The Defendant Hospitals, by and through its agents, contractors and employees, failed to provide Plaintiff services commensurate with her Patient Rights, which proximately caused injury to Plaintiff.

126.     The failure to release patients who have requested so is in violation of § 572.004 of the Texas Health and Safety Code, which requires an employee to assist a patient with writing a request for dismissal if said patient expresses a desire to leave the facility as soon as possible. The facility must then either release the patient within four hours, or, under certain

circumstances, obtain a written order for further detention by 4 p.m. the following day. Here, the facilities failed to follow these requirements. They are keeping people against their will, after the patients have requested to be released, without obtaining the required order of detention.

127.    Violation of 25 Tex. Admin. Code § 415.11(5)(A), (B) for patients who are nursing. Defendants failed to obtain appropriate informed consent and failed to seek to collaborate with the appropriate providers prior to prescribing psychoactive medication.

128.    Chapter 74's conflicts of law provision does not apply in Federal Court because it permits procedural preemption, which allows Chapter 74 to preempt "a rule of procedure or evidence or court rule," without limitation to state courts. Tex. Civ. Prac. & Rem. Code § 74.002.

129.    Alternatively, if some part of Chapter 74's conflict of law provision applies in federal court, then the only effect is that there is a potential cap of mental anguish damages to be applied post-verdict.

<u>**COUNTS IN THE ALTERNATIVE: FALSE IMPRISONMENT**</u>

130.    Plaintiff incorporates all prior and subsequent paragraphs as if fully restated and re-alleged herein.

131.    Plaintiff alleges that each Defendant, acting through its directors, officers, employees and agents, and contract services, willfully admitted Plaintiff without following the standards set forth in Texas Health & Safety Code, Chapter 164 and as such each admission to the hospital and subsequent detention was wrongful, without legal authority or justification.

132.    As a direct and proximate result of Defendants' willful, unjustified, and irresponsible detention and confinement, Plaintiff suffered a loss of her freedom, severe humiliation, embarrassment, fear, frustration and mental anguish.

133.    As a direct and proximate result of Defendants' willful, unjustified and irresponsible detention and confinement of Plaintiff, she has incurred unnecessary medical expenses and have been subjected to unnecessary and unwarranted medical services and other harms and losses.

**COUNTS IN THE ALTERNATIVE: VIOLATING A MOTHER'S RIGHT TO BREASTFEED HER CHILD UNDER TEXAS HEALTH & SAFETY CODE SECTION 165.002.**

134.    Plaintiff incorporates all prior and subsequent paragraphs as if fully restated and re-alleged herein.

135.    Plaintiff asserts a cause of action against the Defendants for failing to allow her to breastfeed her child and pump breastmilk.

**COUNTS IN THE ALTERNATIVE: CIVIL CONSPIRACY; WILLING PARTICIPATION IN TORTIOUS CONDUCT**

136.    Plaintiff incorporates all prior and subsequent paragraphs as if fully restated and re-alleged herein.

137.    Defendants all met with each other for an unlawful purpose or in addition and in the alternative, a lawful purpose but used unlawful means, and had a meeting of the minds on these unlawful objectives, committed an overt act in furtherance of such objectives, and Plaintiff suffered an injury as a proximate result of such wrongful act.

138.    The reason for the conspiracy between the Defendants was to increase profits for all participants, especially the corporate entity: HCA.  To effectuate the conspiracy, Defendant HCA provided financial, administrative, and technical support as well as supervision and staff training on how local staff at the hospitals could increase admissions and lengths of stay for potential patients, to the financial benefit of both Defendants and to the detriment of people like the Plaintiff in this cause.

139.    Plaintiff alleges that the Defendants, acting in concert with each other, and with intent to commit civil conspiracy, and by and through its directors, officers, employees, agents, and contract services, willfully conspired to violate Section 504 of the Rehabilitation Act of 1973.

140.    Plaintiff alleges that the Defendants, acting in concert with each other, and with intent to commit civil conspiracy, and by and through its directors, officers, employees, agents, and contract services, willfully conspired to violate Texas Health & Safety Code, Chapter 164.

141.    Additionally, Plaintiff alleges that the Defendants, acting in concert with each other, and with intent to commit civil conspiracy, and by and through its directors, officers, employees and agents, and contract services, willfully conspired to treat Plaintiff without following the standards set forth in Texas Health & Safety Code, Chapter 571-577 and Chapter 321.

142.    Plaintiff additionally alleges that the Defendants, acting in concert with each other, and with intent to commit civil conspiracy, and by and through its directors, officers, employees and agents, and contract services, willfully conspired to falsely imprison Plaintiff.

143.    As a direct and proximate result of Defendants conspiracy, Plaintiff suffered injuries.

144.    As a direct and proximate result of Defendants civil conspiracy Plaintiff incurred unnecessary expenses.

**COUNTS IN THE ALTERNATIVE: RESPONDEAT SUPERIOR**

145.    Plaintiff incorporates all prior and subsequent paragraphs as if fully restated and re-alleged herein.

146.     Each Defendant is liable for the torts committed by employees or agents under its agency or control, including ostensible agency where those people were acting in the course and scope of their employment or agency at the time of each occurrence.

COUNTS IN THE ALTERNATIVE: NEGLIGENCE

147.     Plaintiff incorporates by reference all of the above related paragraphs, as well as those below, with the same force and effect as if fully set forth herein.

148.     Plaintiff alleges that each Defendant violated the applicable standard of ordinary care by failing to act as a reasonably prudent person would under the same or similar circumstances.

149.     Plaintiff alleges that HCA failed to properly manage, staff, supervise, train, and ensure its staff knew the law.

150.     Upon information and belief, Defendant HCA has one or more management agreements with Green Oaks. Upon information and belief, Defendant HCA represents that it is in the business of providing comprehensive administrative, management, information and other services to Hospital Facilities. Upon information and belief, Defendant HCA has contractually agreed to provide its services in a manner consistent with the prudent and workmanlike management, operation, maintenance and supervision of facilities similar in nature to the hospital defendant in this case. Upon information and belief, among other systems that Defendant HCA agreed to manage for the hospital defendant was the billing system, the collection system; the disbursement system; the payroll system; the insurance claim system; the management information system; and the patient safety improvement system. Defendant HCA was also required to comply with any applicable state and federal laws and assist the hospital in compliance with those laws. Defendant HCA also was required to provide personnel services, including human resources management services for the successful operation of each of the

Hospital Defendants, including consulting on employment and labor issues; providing model policies and best practices; and negotiating contracts for benefits and other services. Defendant HCA was required to provide each hospital defendant with certain personnel necessary for the management of the hospital; in exchange, the hospital was required to pay a management fee to Defendant HCA.

151.    Defendant HCA owed a duty of care in its management of the hospital facilities of Green Oaks. Defendant HCA failed to manage and supervise the hospital in the manner that a reasonably prudent hospital management company would do under the same or similar circumstances.

152.    Plaintiff alleges that Green Oaks, acting through its directors, officers, employees and agents, and contract services, violated the duty of care it owed to Plaintiff to exercise that degree of care, skill, supervision, and diligence ordinarily possessed and used by other mental health treatment centers and hospitals, including hiring and training practices, under the same or similar circumstances.

153.    Plaintiff alleges that each Defendant was negligent in their capacity as health care providers, to the extent that they are health care providers and providing health care. Plaintiff alleges that the Defendants violated the relevant professional standards for a reasonable and prudent mental health and substance abuse treatment facility operating in Texas when they provided inpatient mental health services when it was not necessary, or beneath the operative standards of care.

## COUNTS IN THE ALTERNATIVE: GROSS NEGLIGENCE

154.    Plaintiff incorporates all prior and subsequent paragraphs as if fully restated and re-alleged herein.

155.     Plaintiff alleges that each Defendant's conduct, as described above and as will be more developed at trial, constitutes gross negligence as defined by Texas law. The Defendants' conduct, when viewed objectively from the Defendants' standpoint, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and the Defendants had actual, subjective awareness of the risk involved, but nevertheless proceeded with a conscious indifference to the rights, safety and welfare of others, including Plaintiff. The Defendants' gross negligence was a proximate cause of the occurrence made the basis of this action and all of Plaintiff's resulting injuries and damages.

## VI.
## DAMAGES, COSTS, AND INTEREST

156.     Plaintiff incorporates all prior and subsequent paragraphs as if fully restated and re-alleged herein.

157.     As a direct proximate result or as a producing cause of the acts and/or omissions described above, Plaintiff has suffered injuries and damages for which Plaintiff seeks recovery from Defendants.

158.     As applicable, Plaintiff seeks full and fair compensation for actual damages.

159.     As applicable, Plaintiff seeks attorneys' fees.

160.     As applicable, Plaintiff seeks treble damages.

161.     As applicable, Plaintiff seeks exemplary or punitive damages considering (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; (5) the extent to which such conduct offends a public sense of justice and propriety; and (6) the net worth of the defendant.

162.    Plaintiff seeks personal injury damages in amounts the jury deems to be fair and reasonable consisting of the following:

- Past and future physical pain and mental anguish;

- Past and future loss of earnings and earning capacity;

- Past and future physical impairment;

- Past and future medical and healthcare expenses and mental care expenses; and/or

- Any other actual or compensatory damages allowable by law.

163.    Plaintiff also seeks recovery for all costs of court and prejudgment and post-judgment interest at the maximum rates allowed by law.

## VII.
## PRAYER

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants and award Plaintiff the following relief:

(i)     A sum of money—as determined by a jury to be fair and reasonable—within the jurisdictional limits of this Court for the damages indicated above, at the Plaintiff's election of remedy, to the extent applicable;

(ii)    Pre-judgment and post-judgment interest at the maximum amount allowed by law;

(iii)   Costs of suit; and

(iv)    Such other and further relief to which Plaintiff may be justly entitled.

RESPECTFULLY SUBMITTED:

**THE LAW OFFICES OF**
**FRANK L. BRANSON, P.C.**

*/s/ John Tindall Burkhead*
John Tindall Burkhead
Texas Bar No. 24072010
*jburkhead@flbranson.com*

Highland Park Place
4514 Cole Avenue, 18th Floor
Dallas, Texas 75205
214.522.0200 [Telephone]
214.521.5485 [Facsimile]

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record via the CM/ECF System on this 31st day of March, 2021.

*/s/ John Tindall Burkhead*
John Tindall Burkhead